2024 UT App 195

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SCOTT FLORES,
Appellant.

Opinion
No. 20220234-CA
Filed December 27, 2024

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 201402844

Emily Adams, Freyja Johnson, and Melissa Jo
Townsend, Attorneys for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 A jury convicted thirty-two-year-old Scott Flores of raping fifteen-year-old Mary.[1] On appeal, Flores claims the trial court wrongly denied a motion for a new trial. Flores also brings claims of ineffective assistance of counsel. We reject Flores's claims of error and ineffective assistance of counsel and affirm his conviction.

---

1. A pseudonym.

## BACKGROUND[2]

¶2    Mary began selling some of her old clothes on an app. Flores contacted her through the app and arranged to purchase some of the clothes. Mary gave Flores an address near her home to meet, and the two exchanged clothes for payment a few times without incident. Flores told Mary the clothes were for his sister, who he claimed was the same age as Mary. In messages to Mary, Flores said he was "originally from New York" and had been in Utah for "like five months" and didn't know many people. He told Mary that his sister had also just moved to the area and "didn't really know anybody," so he wanted Mary to meet her. Mary agreed to meet his sister because she also didn't know many people and was "hoping to be friends" with his sister.

¶3    One evening about two weeks after Flores and Mary began talking, the two arranged another clothing purchase. Flores arrived in a van at the same location near Mary's home. He told Mary he wanted her to show the clothes to his sister. Mary opened the van door expecting to see Flores's sister but saw no one. Flores told Mary that his sister "was just like 15 minutes up the street" at her house and asked Mary if she wanted to go meet her. Though a "little bit" worried, Mary got in the van. Mary was unfamiliar with the area they drove through, but Flores told her they were going to a nearby city where his sister lived.

¶4    On the drive, they made a stop at a gas station because Flores said he wanted to buy his sister a drink. He asked if Mary wanted anything, and she said she did not. After returning from making his purchase, Flores drove to a house and parked. By this time, it was dark outside. Flores and Mary talked in the van for

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

about five minutes before Mary asked where his sister was. He responded, "Oh, she's just inside." Flores then got out of the van and went behind the house.

¶5    After about ten minutes, Flores returned to the van without his sister. When Mary asked where she was, Flores replied that his sister "was eating dinner with her aunt" at a restaurant. He told Mary that his sister would be "back any minute," so they decided to wait for her. After more waiting, Mary "wasn't really sure if [Fores's sister] was even going to come" and told Flores she needed to be home by a "certain time."

¶6    Flores then began to make Mary feel "uncomfortable" when he asked if she smoked marijuana, to which she replied that she had but didn't like "the way it made [her] feel." He told her that the marijuana he had would make her "calm" and wouldn't cause any harm. Mary declined, but Flores began smoking. Once he finished, the two began talking again, and Flores asked Mary if she was a "good kisser" and whether she "would show him," which made Mary "[r]eally uncomfortable." She told him no and that she had a boyfriend (Boyfriend).

¶7    Without Mary's permission, Flores began touching her breasts. Mary told him to stop, but he continued to touch her. She tried to move "back as far as [she] could." Mary testified that she "felt like it was going to go really bad and there wasn't really much [she] could do" because she was in an unfamiliar place and didn't know "what he was capable of." She "kind of aggressively moved his hand" but did not use her "full force" because she was scared. Flores moved closer to her and began rubbing her thighs and then her vagina. Mary continued to try to move his hand away. Flores then removed her pants and underwear and continued touching her vagina. After pushing Mary's legs open, Flores removed his own pants and underwear, got on top of her, and "put his penis inside" of her. Mary looked "[a]way, like outside the window." Flores was on top of her for "[m]aybe two minutes" before he ejaculated, got off her, and removed a

condom. Flores and Mary each put their clothes back on, and Flores drove her home. Flores told Mary not to tell anyone. After returning home, Mary "let [her] emotions go and started crying" and then took a shower. She did not tell anyone what had happened.

¶8 The next night, Mary met up with Boyfriend and told him that "the guy [she] was selling clothes to [had] raped" her. Boyfriend helped Mary call her mother (Mother) and the police. Boyfriend also told his brother (Brother) what had happened. Mary and Boyfriend said police told them they did not have enough information about Flores or his van, so Mary, Boyfriend, and Brother devised a plan to get it. Mary messaged Flores in the app to meet her at a park. Brother instead went to the park to see Flores, while Boyfriend and his mother took Mary to the hospital.

¶9 Flores arrived at the park, and Brother took a picture of Flores's license plate. Brother then sent the photo to Boyfriend, who shared it with police.

¶10 At the hospital, Mary underwent an examination and described the assault to a sexual assault nurse examiner (Nurse). Mary described the incident as outlined above, except Nurse testified that Mary told her that Flores "put his mouth on her breasts." As part of Nurse's testimony, the State moved to admit, and the court received, her report (Exhibit 15), which included a summary of Mary's description of the events. When asked about her sexual history, Mary told Nurse that she and Boyfriend had sex a day or two before the assault. Nurse found a small bruise high on the inside of Mary's left thigh. Nurse testified that she does not see bruising in this area for a "routine pelvic exam" because it is a well-protected area that women are unlikely to bump. Nurse did not recall any genital injuries but testified that a lack of such injuries was not unusual as they are only found in "about 50 percent of cases." She explained that Mary's age and sexual activity also decreased the chance of injury.

¶11 Mary testified that in the time following the assault, it was "hard to view [herself] the same and love [herself]," explaining that it had always been difficult for her but it now felt "impossible." She struggled to go to school and work due to fear. Boyfriend testified that since the assault, Mary appeared "more depressed," "didn't want to eat," didn't want to "go to school," and cried "a lot." Mother testified that after the assault, Mary was showering four times a day because she "want[ed] him off of [her]." She also testified that Mary began "ripping," "scratching," and "clawing" at her skin trying to get "him off of her."

¶12 About ten months after the assault, Mary unsuccessfully attempted suicide by swallowing a "bunch of pills." Mary left a suicide note, discovered by Boyfriend, that stated,

> I just couldn't love myself I believe in god now
> Hopefully I come Back as a person that doesn't have
> so many problems I'll see Scott in Hell tho Fuck you
> I H8 you I didn't love myself B4 that and Now I can't
> ever learn How to. Fuck you.

Just before 5:00 p.m. the Friday before trial, the State filed a motion to admit the note. The State argued that the note was admissible because it corroborated Mary's change in behavior. Flores's trial counsel (Counsel) objected because of the late disclosure. The court determined that the note was admissible "to show injury and . . . to corroborate that the harm occurred" but ordered the parties to draft a jury instruction that the note should be considered only as to whether it corroborated evidence of guilt rather than "to arouse sympathy or pity." Mary testified that the "Scott" in her note referred to Flores. She also testified that what "was going through [her] mind" when she attempted to take her life was "what had happened and how the trauma stayed" with her.

¶13 Because Mary was unfamiliar with the area Flores took her on the night of the assault, she was unable to identify where it was

for police. However, Mother testified that a few days after the assault, she and Mary were driving when Mary "freaked out," said to turn around, and "started trying to grab the wheel." She explained that the gas station they had just passed was the one Flores took her to. Police searched the gas station's surveillance cameras and obtained a receipt, which linked Flores to making a purchase. After seeing a plumbing company logo on Flores's sweatshirt in the surveillance video, police contacted the company owner and identified Flores. The owner also confirmed that Flores worked for him in Utah from September 2014 until he let him go in February 2018.

¶14 The investigation included DNA testing. The swab of Mary's vaginal vault came back with male DNA, but it was an "insufficient quantity" to test. The swab of Mary's pubic area returned male DNA that matched Boyfriend. A forensic scientist testified that the use of a condom "would reduce the chances of finding DNA."

¶15 Investigators also collected many of the messages Mary and Flores sent to one another. With Mary's assistance, this information was provided through screenshots and a forensic download of all the information on her cell phone. But it did not include any information stored in the app. From the license plate number, police also confirmed that Flores was the owner of the van. A search of Flores's known relatives revealed only a spouse and no sister.

¶16 The State charged Flores with rape, object rape, and forcible sexual abuse. At trial, the State argued that Flores had used a "fictional" sister to "gain [Mary's] trust," "lure[] her away from her house and sexually assault[] her." The State emphasized what it called the "powerful corroborative evidence" of Mary's change in behavior and pointed to her attempted suicide as "post-corroborative behavior that she went through a traumatic event." The State told the jury that the suicide note by itself was "proof

beyond a reasonable doubt" that the events occurred as Mary said they did.

¶17    Counsel argued that Flores exercised no coercion or force over Mary; instead, she voluntarily got in his van, and they drove to the gas station. Counsel pointed out that Mary did not provide police with screenshots of all her communications with Flores on the app and subsequently deleted the app so that the conversation "disappeared." Counsel argued that there were discrepancies in Mary's story about the timing of events after leaving the gas station, inviting the jury to look at Mary's statement in Exhibit 15 during its deliberations. He further argued that it was physically impossible for Flores to have had sex with Mary sitting in the passenger seat. Counsel pointed out that the detective (Detective) on the case testified that investigators narrowed down the possible gas stations to one and asked Mary and Mother to go confirm it was the right one, which directly conflicted with Mary's and Mother's stories. Counsel emphasized that prior to these events, Mary already suffered from depression and was seeing a therapist. He reasoned that the description of the events leading up to Boyfriend discovering the suicide note did not make sense, which—in addition to the late disclosure of the note—indicated that Mary and Boyfriend had fabricated the note to help the State's case. Counsel pointed the jury to the fact that Boyfriend was glaring at Flores and testified that he loved Mary and "would do anything for her, unconditionally." Ultimately, Counsel argued that Mary's account of the assault was fabricated.

¶18    While Counsel alluded to the possibility that Flores would testify during his opening statement, Flores ultimately did not testify.

¶19    After deliberation, the jury convicted Flores on all three charges. Flores obtained new counsel and filed a motion for a new trial, in which he asserted that certain evidence should not have been admitted at trial and that Counsel had provided ineffective assistance by failing to object to the admission of this testimony

and evidence. The trial court denied the motion, ruling that all the arguments were "unpreserved" as they were not "raised during trial." The court also stated that "even were the merits of [Flores's] arguments addressed, the motion would still be denied" as the related issues did not constitute errors and Counsel "was not deficient for failing to raise them."

## ISSUES AND STANDARDS OF REVIEW

¶20 Flores raises several issues on appeal. First, Flores argues that Counsel provided him with ineffective assistance by failing to object to (1) "multiple pieces of inadmissible hearsay evidence," (2) the State submitting evidence of Mary's behavioral changes and attempted suicide, and (3) "Exhibit 15 going back to the jury room during deliberations." When, as here, ineffective assistance of counsel claims were raised below in a motion for a new trial, Flores's claims present a mixed question of fact and law, and "we defer to the trial court's findings of fact, but review its application of the appropriate legal principles to its factual findings for correctness." *State v. Tippets*, 2021 UT App 137, ¶ 18, 501 P.3d 570 (cleaned up).

¶21 Next, Flores argues that the trial court erred in denying his motion for a new trial. "Our review of a trial court's decision to grant or deny a motion for a new trial is two-fold." *Senkosky v. Bistro 412 LLC*, 2022 UT App 58, ¶ 21, 512 P.3d 477. We first "evaluate the trial court's determination of whether an error occurred that may require retrial." *Id.* If the trial court's decision of whether an error existed required it to make a factual determination, we afford deference to the court's ruling. *Id.* If the decision did not require a factual determination, we review the court's ruling for correctness. *Id.* "Second, we review the court's determination of whether the alleged error was harmful for an abuse of discretion." *Id.*

ANALYSIS

I. Ineffective Assistance of Counsel

¶22 To bring a successful "ineffective assistance of counsel claim, a defendant must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *Id.* (cleaned up).

¶23 The deficient performance prong requires a defendant to "show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," meaning that a defendant must overcome the presumption that counsel's action "might be considered sound trial strategy." *Id.* at 689 (cleaned up).

¶24 The prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). "That is, the defendant's showing must undermine our confidence in the outcome." *Id.* (cleaned up). The impact of such alleged errors must "be a demonstrable reality." *Id.* (cleaned up).

¶25 Flores argues that Counsel was ineffective for failing to object to (1) several pieces of alleged hearsay, (2) the introduction of evidence of Mary's behavioral changes and attempted suicide, and (3) Exhibit 15 going into the jury room during deliberations. We address each in turn.

A.    Alleged Hearsay

¶26    Hearsay is a "statement that . . . the declarant does not make while testifying at the current trial" that "a party offers in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). "Hearsay is not admissible except as provided" by statute or the Utah Rules of Evidence. *Id.* R. 802.

¶27    Flores argues that Counsel provided ineffective assistance by failing to object to inadmissible hearsay evidence from Mary, Boyfriend, Mother, and Detective at trial. Flores argues that their testimony informed the "jury through several witnesses that [Mary] consistently told others that she had been raped and inappropriately touched by" Flores, thus "bolster[ing] her credibility." Flores directs us to the following statements:

- Mary's testimony that, on the day after the assault, she told Boyfriend, "[T]he guy I was selling clothes to, raped me";

- Boyfriend's testimony that Mary told him, "[S]he met up with some guy called Flores, that she went inside the car 'cause she was [supposed] to meet someone, his sister or something, and that she got raped";

- Mother's testimony in response to the State asking what Mary "told" her, in which Mother stated, "I was told that my little girl was raped by that man";

- Mother's testimony that Boyfriend and his mother told her that Mary was "sexually assaulted by [Flores]"; and

- Detective's testimony in response to the State asking what Mary and Boyfriend "told" him, in which Detective summarized Mary's account of the rape by saying, "[Mary] stated that [Flores] got out of the vehicle, walked behind the shed and came back, sat back down in the vehicle with

her, they were both in the front seat and began to rub her thigh and she told him to stop. He then [lay] on top of her, pulled her pants down even though she told me that she was actively trying to pull her pants back up, telling him stop, don't do this, stop, I don't want to do this, and he would just respond with huh, or what? And then at that point she said that he had raped her and then after that he got off, took her back home . . . and told her not to tell anyone what had happened."

Because Flores fails to demonstrate ineffective assistance with respect to this testimony for different reasons, we address the challenged testimony of Mary, Boyfriend, and Mother separately from that of Detective.

1.      Testimony of Mary, Mother, and Boyfriend

¶28    In the recently issued opinion, *State v. Garcia*, 2024 UT App 38, 546 P.3d 990, *cert. denied*, 550 P.3d 997 (Utah 2024), our court addressed a similar fact scenario to that at issue here—details of a victim's sexual abuse were repeated at trial by those to whom she had earlier disclosed it. In *Garcia*, the victim's mother and a police detective testified at trial about the details of the abuse the victim had disclosed to them. *Id.* ¶¶ 2, 13–14. After conviction, the defendant argued that he received ineffective assistance when his counsel failed to object to the mother's and the detective's testimony regarding the victim's out-of-court statements because "competent counsel would have concluded that this testimony was inadmissible hearsay." *Id.* ¶ 37. In addressing the alleged error, this court determined that "reasonable defense counsel could have concluded that [certain statements] were not hearsay because they were not offered for their truth" but instead "offered only to explain" in that case "why [the mother] contacted the police and why [the detective] conducted an investigation." *Id.* ¶ 41. The court continued that even if it had concluded that the witnesses' "statements of the mere fact that [the minor victim] disclosed the abuse to them were hearsay," the court "could not

say that such testimony was prejudicial" to the defendant because a minor victim disclosing "alleged abuse to a family member and, subsequently, to law enforcement is an essentially inescapable inference that anyone would draw from the simple existence of the criminal case itself." *Id.*

¶29 The same reasoning applies here to Mary's, Mother's, and Boyfriend's challenged statements. Counsel could have reasonably concluded that these statements were "not hearsay" because they "were offered for purposes other than to prove the truth of the matter asserted" and thus were "properly admitted at trial." *State v. Olsen*, 860 P.2d 332, 336 (Utah 1993). These statements provided foundation and context for Mother's and Boyfriend's testimony describing Mary's emotional state after the incident. That testimony would make sense only if Mother and Boyfriend had been made aware of some of the details of the incident and when it occurred. Moreover, Mary's statements to Boyfriend were admitted to explain why Boyfriend conducted himself in the manner he did—taking Mary to the hospital, observing Mary's emotional state, obtaining Flores's license plate number. Again, these actions of Boyfriend would make sense only if Mary had told Boyfriend that she had been harmed. Given these circumstances, we conclude that Counsel did not perform deficiently based on the reasonable conclusion that the challenged statements, in light of our caselaw, did not constitute hearsay.

2.     Testimony of Detective

¶30 Though law enforcement witnesses may provide background information to explain their subsequent conduct under the "so-called 'police investigation exception'" to hearsay, Detective's testimony likely went too far. *See State v. Valdez*, 2021 UT App 13, ¶ 56, 482 P.3d 861. The "precise parameters of the police investigation exception in Utah" have not been set forth. *Id.* However, "lengthy narrative testimony" about what a person reporting a sexual assault told police happened, like Detective's testimony here, is not admissible under the "police investigation

exception." *Id.* But even though this was the case, and even assuming for purposes of the discussion that Counsel performed deficiently by not objecting to Detective's lengthy narrative, we conclude that Flores was not prejudiced by Counsel's failure to object to Detective's repetition of the information he had received from Mary and Boyfriend.

¶31 "[W]here testimony is merely cumulative, we are disinclined to find prejudice even when the testimony was improperly admitted." *State v. Jones*, 2020 UT App 31, ¶ 35, 462 P.3d 372. "This is so because cumulative testimony typically doesn't offer anything new or additional to the evidentiary picture." *State v. Samples*, 2022 UT App 125, ¶ 74, 521 P.3d 526 (cleaned up), *cert. denied*, 525 P.3d 1279 (Utah 2023); *see also State v. Soto*, 2022 UT App 107, ¶ 27, 518 P.3d 157 ("[T]here is no reasonable probability that the detective's repetition of [the victim's] statements altered the outcome because [the victim] testified at trial and recounted the same facts."), *cert. denied*, 526 P.3d 827 (Utah 2022); *State v. Thomas*, 777 P.2d 445, 450 (Utah 1989) ("We conclude that the trial court erred in allowing the officer to testify to the full content of the interview. In view of the fact, however, that the officer's testimony was merely cumulative to that already testified to by the victim, the error was harmless . . . ."). Here, Detective's testimony was merely a repetition of Mary's testimony and other properly admitted testimony from Mother and Boyfriend. And Flores has failed to persuade us that there is a reasonable probability that he would have received a more favorable outcome if the jury had not heard this cumulative testimony.

¶32 In sum, Flores's ineffective assistance claim fails because an objectively reasonable attorney could have chosen not to object to the admission of Mary's, Mother's, and Boyfriend's testimony. And Flores's ineffective assistance claim regarding Detective's testimony fails for lack of prejudice.

B.      Mary's Behavioral Change and Suicide Note

¶33     Flores argues that Counsel performed deficiently by not objecting to the State submitting evidence of Mary's changes in behavior and attempted suicide, including the note "purportedly written by [Mary], which was not disclosed to the defense until the eve of trial." Counsel did in fact object to the introduction of Mary's suicide attempt and note by arguing that the evidence was untimely because the State didn't disclose it until shortly before trial, which gave Counsel no time to conduct "an investigation." The court overruled the objection and admitted the evidence but ordered the parties to draft a jury instruction that the evidence was to be considered only as potential corroboration of guilt rather than to "arouse sympathy or pity." However, Flores argues that Counsel should have additionally objected under rules 104 and 403 of the Utah Rules of Evidence because the State "failed to introduce sufficient evidence to support a finding by a preponderance of the evidence that [Mary's] purported behavioral changes and attempted suicide corroborated the alleged sexual assault."

¶34     Flores contends that our precedent—which on numerous occasions has upheld the admission of behavioral change evidence in rape cases—is not applicable here because those cases involved expert testimony and "the State did not use any expert testimony to tie the incident to Mary's attempted suicide 10 months after the incident occurred." *See, e.g., State v. Martin*, 2017 UT 63, ¶¶ 22, 32, 423 P.3d 1254 (forensic interviewer); *State v. Sloan*, 2003 UT App 170, ¶¶ 8, 25, 72 P.3d 138 (mental health therapist). We disagree. Our caselaw is clear that behavioral change evidence may be admissible—even without expert testimony to support it—as "circumstantial evidence that the alleged act occurred" where the central issue at trial is "whether the abuse ever happened." *State v. Anderson*, 2020 UT App 135, ¶ 26, 475 P.3d 967. For example, in *Anderson* our court determined that trial counsel's decision not to object to testimony from a sexual abuse victim's family members about his behavioral

changes was not unreasonable because the testimony "provided circumstantial evidence to corroborate the victim's testimony that the abuse occurred." *Id.* ¶¶ 25–26; *accord State v. Dever*, 2022 UT App 35, ¶ 44, 508 P.3d 158 (holding that a mother's testimony regarding her daughter's change in behavior after an alleged rape was "sufficient to corroborate [the daughter's] account"); *State v. Cosey*, 873 P.2d 1177, 1182 (Utah Ct. App. 1994) (holding that testimony from a mother about "a drastic change in the victim's behavior [was] relevant circumstantial evidence that a traumatic experience such as rape" had occurred).

¶35 Thus, applying our state's controlling caselaw, reasonable counsel could have believed that any objection to this evidence would have been futile. Accordingly, Counsel did not perform deficiently by choosing not to object to admissible evidence of Mary's behavioral changes and attempted suicide and note.

### C. Exhibit 15

¶36 Flores argues that Counsel was ineffective for not objecting to the jury taking Exhibit 15 into the deliberation room. Exhibit 15 was the report Nurse compiled as part of her examination of Mary. Exhibit 15 included Mary's summary of the incident as transcribed by Nurse. At the conclusion of the trial, the court instructed the jury to consider "any exhibits admitted into evidence" in its deliberations, which would have included Exhibit 15. Counsel made no objection.

¶37 Rule 17 of the Utah Rules of Criminal Procedures states,

> Upon retiring for deliberation, the jury may take with them . . . all exhibits which have been received as evidence, except exhibits that should not, in the opinion of the court, be in the possession of the jury, such as exhibits of unusual size, weapons or contraband.

Utah R. Crim. P. 17(k). The rule "expressly allows the jury to take *all* exhibits back to deliberations except those which the court decides in its discretion the jury should not have." *Wyatt v. State*, 2021 UT 32, ¶ 19, 493 P.3d 621. Our supreme court has noted that "transcripts of deposition testimony and of testimony given under oath at a prior proceeding are not received as exhibits and do not go back with the jury." *Id.* ¶ 19 n.17. However, to reach its determination that such transcripts are not allowed under rule 17, the court emphasized that the rule is "detailed and specific" about what items may go in the jury room—the rule explicitly includes exhibits. *Id.* It was the "negative implication" that items not included in the rule could not go in the jury room, which led to its conclusion that transcripts of deposition testimony and other testimony under oath from other proceedings were not allowed. *Id.* The explicit rule language and our supreme court's reasoning alone bring us to the conclusion that it was well within the trial court's discretion to allow Exhibit 15 to go back with the jury. An objectively reasonable attorney would know that and could therefore reasonably decide not to object.

¶38 Flores tries to argue that Exhibit 15 should have been objected to because it included the written account of Mary's description of the assault, thus "mimick[ing]" Mary's "testimony at trial." Flores asserts that reasonable counsel would have objected because Exhibit 15 was "effectively a transcript" of Mary's trial testimony. But Exhibit 15 was not a transcript, and an objectively reasonable attorney would know that. The statement was not deposition testimony, testimony given under oath, or a statement made in a prior proceeding, and as such "there was no reason for [Counsel] to object to [Exhibit 15] accompanying the jury into its deliberations." *See State v. Green*, 2023 UT 10, ¶ 110, 532 P.3d 930.

¶39 Furthermore, in closing argument, Counsel specifically encouraged the jury three times to look at Exhibit 15. He asked the jury to look at discrepancies between Mary's statement in Exhibit

15 and her testimony in court. This reflected a specific strategy to use Exhibit 15 to Flores's benefit. *See State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶40     Thus, Counsel did not perform deficiently when he chose a sound trial strategy not to object to Exhibit 15, and Flores's claim fails.

## II. Motion for a New Trial

¶41     Under rule 24 of the Utah Rules of Criminal Procedure, a "court may . . . grant a new trial in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party." Utah R. Crim. P. 24(a).

¶42     Flores moved for a new trial on three grounds: (1) the "State elicited multiple pieces of inadmissible hearsay evidence," (2) the "State's evidence about changes in behavior and attempted suicide was inadmissible," and (3) the trial court erred in denying Flores's motion to present Mary's Children's Justice Center video. In each instance, Flores attacked the admission of the evidence on its merits, asserting trial court error and also making a claim that Counsel provided constitutionally ineffective assistance. The trial court denied the motion, ruling,

>       Because none of the arguments were raised prior to or during trial, the court declines to exercise its discretion to grant the motion for new trial. On this basis alone, the motion will be denied.

>       Moreover, even were the merits of [Flores's] arguments addressed, the motion would still be denied. The errors [Flores] identifies were not errors, and [Counsel's] performance was not

deficient for failing to raise them. Therefore, [Flores's] rights were not adversely affected.

¶43 Flores argues that the trial court erred in determining that his arguments were "unpreserved" because they were not "raised prior to or during trial." Flores contends that rule 24 has no preservation requirement, which he asserts is an *appellate* doctrine, not something applicable to the exercise of discretion in a trial court. *See State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 ("When a party fails *to raise* and argue an issue in the *trial court*, it has failed *to preserve* the issue, and an *appellate court* will not typically reach that issue absent a valid exception to preservation." (emphasis added)).

¶44 While Flores may be correct that rule 24 does not include a formal preservation requirement, we nevertheless conclude that the trial court acted within its discretion in denying the motion. As the trial court explicitly stated, the putative lack of preservation was not the only basis on which it declined to exercise its discretion in denying the motion for the new trial. The trial court stated that Flores's motion would also be denied on the merits of his arguments. Then it spent nearly seven pages of its ruling and order analyzing and rejecting each of Flores's substantive arguments. Thus, aside from the question of whether the trial court abused its discretion in determining that the motion was untimely, we have no hesitancy in affirming the trial court's denial of Flores's motion for a new trial on the merits as the court did in *State v. Johnson*, 821 P.2d 1150 (Utah 1991).[3]

_____

3. When, as here, a trial court chooses to address the merits of an issue it has determined to be waived, we will "consider the issue on appeal" as being preserved and reviewable at the request of an appellant. *See State v. Johnson*, 821 P.2d 1150, 1161 (Utah 1991) ("Because the trial court addressed the corpus delicti issue fully and did not rely on waiver, we consider the issue on appeal, even

(continued…)

¶45    Regarding the Mother's and Boyfriend's testimony, it was admissible for the same reasons we identified above. *See supra* ¶¶ 28–29. Accordingly, the trial court did not err in concluding that Mary's disclosures to Mother and Boyfriend were properly admitted at trial and denying Flores's motion for a new trial on this ground. And as we pointed out above, the challenged testimony of the Detective was cumulative of other properly admitted testimony. *See supra* ¶¶ 30–31. Thus, any error that accompanied its admission was harmless to Flores—at least Flores has not persuaded us that allowing Detective to testify to the extent he did regarding the details of the rape Mary divulged to him had any appreciable impact on the outcome of the verdict. As our rules dictate, "No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Utah R. Civ. P. 61. And a new trial may be granted for an "irregularity in the proceedings of the court . . . by which a party was prevented from having a fair trial." *Id.* R. 59(a)(1). Given that Detective's challenged testimony was merely cumulative of properly admitted testimony, we fail to see how Flores was deprived of a fair trial such that the trial court erred in denying his motion for a new trial.

¶46    Regarding evidence about changes in Mary's behavior and her attempted suicide, as we pointed out above, our caselaw is clear that behavioral change evidence may be admissible to corroborate that an alleged act occurred—even without expert testimony to support it. *See supra* ¶ 34. Accordingly, the trial court did not err in denying Flores's motion for a new trial on this basis.

---

though trial counsel failed to properly preserve it as required by Utah Rule of Evidence 103(a)(1)."); *see also State v. Pinder*, 2005 UT 15, ¶ 49 n.7, 114 P.3d 551.

¶47 The final grounds on which Flores moved for a new trial was that he should have been allowed to present Mary's Children's Justice Center interview because it contained evidence that would have provided an alternative explanation for Mary's behavioral changes—that she had been sexually abused before by someone other than Flores—and this evidence would have aided in his defense. The trial court found this argument was without merit because Flores presented no evidence that the prior abuse resulted in a change in behavior. Specifically, the trial court determined that this evidence was properly excluded under rule 412 of the Utah Rules of Evidence because Flores could not "proffer a weighty interest that would be significantly undermined by the application of the rule" and because establishing "an alternate source" of Mary's "psychological injuries and emotional trauma" was "without foundation." Flores has not challenged this ruling on appeal and we detect no abuse of discretion in the court's determination that no error occurred.

## CONCLUSION

¶48 We conclude that Counsel was not ineffective for choosing not to object to allegedly inadmissible hearsay evidence, evidence of Mary's change in behavior and attempted suicide, or Exhibit 15's presence in the jury room during deliberations. We also determine that the trial court did not abuse its discretion in denying Flores's motion for a new trial.

¶49 Affirmed.

_____