2025 UT App 189

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
REDWAN A. YUSUF,
Appellant.

Opinion
No. 20240190-CA
Filed December 18, 2025

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 221904313

Dain Smoland and Staci Visser,
Attorneys for Appellant

Derek E. Brown and Erin Riley,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and JOHN D. LUTHY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Following an altercation with his wife (Wife) that took place in front of three children, Redwan A. Yusuf was charged with aggravated assault, three counts of domestic violence in the presence of a child, attempted mayhem, and assault. At trial, the State called Wife as a witness. In addition, over Yusuf's objection, the State introduced a video recording of Wife's interview with police on the night of the incident. The district court subsequently allowed, again over Yusuf's objection, the jury to have access to the video during deliberations. Thereafter, the jury found Yusuf guilty on all counts.

¶2 Yusuf now appeals. He argues that the district court improperly admitted the video of Wife's interview into evidence and that had the video not been improperly admitted, the result of the trial would have been different. We agree with Yusuf and accordingly vacate his convictions and remand the matter for a new trial.

## BACKGROUND[1]

### *The Alleged Assault*

¶3 One evening, Yusuf was upstairs in the home he shared with Wife and their four children. Wife was in the kitchen downstairs mopping the floor. Wife claimed that Yusuf came down the stairs and he was "angry" and "yelling" at her. Wife reported that Yusuf grabbed her by her hair and threw her to the ground. Wife, who was seven months pregnant with their fifth child, stated that she tried to cover her stomach with her hands. According to Wife, Yusuf held her neck with one hand while he continued to push her to the ground. Wife claimed she saw a "small" knife in Yusuf's other hand and he was "gesturing" that

---

1. "On appeal from a jury verdict, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, presenting conflicting evidence only as necessary to understand issues raised on appeal." *State v. Dever*, 2022 UT App 35, n.2, 508 P.3d 158 (quotation simplified). "Recognizing, however, that our reversal of [Yusuf's] conviction[s] causes the presumption of innocence to reattach, we apply the foregoing standard somewhat guardedly here. Specifically, concerning the facts surrounding the charged crimes, we identify the evidence that supports the verdict, while refraining from characterizing the alleged criminal conduct as established fact." *State v. Jimenez*, 2025 UT App 76, n.1, 571 P.3d 834 (citation omitted), *petition for cert. filed*, July 23, 2025 (No. 20250834).

he would "hit" her with it. Wife "felt he may . . . kill" her so she "started screaming."

¶4 Wife explained that one of the children in the house heard her screaming and came to help. The child reportedly told Yusuf to "stop" and then ran to call his brothers. Wife stated that although Yusuf did not stop holding her down, he did hide the knife somewhere, possibly "in his pocket." According to Wife, Yusuf proceeded to kick and punch her in her back and kidneys. At this point, the child returned with two other boys. Wife claimed that all three children jumped in to try and stop Yusuf, but Yusuf continued to pull on Wife until the clothing she was wearing "tore apart." Then, Yusuf allegedly pushed his index and middle fingers into Wife's eyes and "tr[ied] to pull [her] eyes out." Wife reported that the altercation eventually ended after one of the children gave Wife a phone and Yusuf saw Wife calling 911.

*The Investigation*

¶5 When police arrived at the house, they spoke to Wife. One of the officers (Officer) recorded his five-minute conversation with Wife on his body camera (the video). The video shows Wife—who appears visibly bedraggled and emotionally upset—reenacting the assault on one of her young sons by pulling his hair, grabbing him on the back of his neck, pushing him to the ground, and punching him in the back. During this reenactment, Wife describes to Officer what she is doing in English. In the background, the layout of the downstairs of the house is visible, as are multiple other children, the youngest of whom is an infant.[2]

---

2. At the time of the incident, additional children were upstairs in the house. Although some of these children had moved downstairs by the time Officer arrived and are visible in the video, only three children actually witnessed the incident.

¶6 Officer also took photographs of Wife's injuries. He noticed that Wife's "cheeks were very red," but he did not notice any other injuries. And although Officer searched for the knife Wife alleged Yusuf had brandished during the incident, he was unable to find one.

¶7 Approximately one week after the incident, Yusuf was interviewed over the phone by a detective (Detective). At the beginning of the roughly nine-minute conversation, Yusuf told Detective that his English was not great. Detective did not use an interpreter, however, because he felt Yusuf was able to understand him and could explain what had happened. Yusuf proceeded to tell Detective that the argument with Wife started over bills. He said that Wife "got in his face" and then "she fell and grabbed onto his shirt or his neck area." Yusuf claimed that after Wife fell, he "called for one of [his] children to come downstairs and help her" and then he left. Detective asked Yusuf "several times" if anything physical happened, and Yusuf consistently said "no." Detective also asked Yusuf multiple times about having a knife. In response to the first inquiry, Yusuf gave a non-responsive answer, telling Detective that he was a truck driver and "leaves the house for long periods of time." When pressed again, Yusuf told Detective there was no knife.

¶8 Yusuf was charged with aggravated assault, three counts of domestic violence in the presence of a child, attempted mayhem, and assault.

*The Pretrial Proceedings*

¶9 After the case was set for a jury trial to begin on November 6, 2023, the district court issued a pretrial scheduling order. That order included the following motion deadline: "All motions, *including any motions in limine*, must be filed no later than September 15, 2023. Absent a showing of good cause, the failure to file a motion within this time period may result in waiver of the

issue." (Emphasis added.) The parties were also ordered to "disclose witness and exhibit lists to the opposing party" "no later than 14 days" before trial. Here, that date fell on October 23, 2023.

¶10　On September 25, 2023—after the motion deadline but before the witness and exhibit lists deadline—the State filed its witness and exhibit lists. The video was included on the exhibit list.

*The Trial*

¶11　Jury selection took place on November 6, 2023. The next day, right before the State's opening statement, Yusuf's counsel notified the court that he intended to object to two of the State's proposed exhibits—one of which was the video. He explained that the video was hearsay that would serve to bolster the testimony of Wife, who was present at trial and planned to testify. Yusuf's counsel asked the court whether it would "prefer" to address his objections when the evidence was introduced or before the jury arrived. The court replied, "We can do it now."

¶12　The State then objected to Yusuf's motion to exclude the video. At the outset, the State reminded the district court of the "September 15 deadline" for filing motions in limine. The court responded, "I know. Get to the substance." The State proceeded to argue that the video was not hearsay because the purpose of the video was to show "the physical layout" of the house, Wife's "physical state" after the incident, and Wife's "tone" when talking to Officer.

¶13　The district court denied the motion. The court concluded that the video was admissible as "a prior consistent statement." In addition, the court noted that the State's timeliness argument was "a fair point" because Yusuf had apparently known about the video "for a long time." Given this fact, the court also found that the motion was "untimely."

¶14 Following the district court's ruling, the State presented its opening statement. After that, Wife was called to the stand. With help from an interpreter, Wife recounted the incident consistently with the above narrative. During Wife's testimony, six of Officer's photographs from the night of the incident were introduced into evidence. These photos depicted Wife's disheveled hair and flushed face, "scratches" on her hand and chin, as well as a small cut on the bridge of her nose. Although Wife testified that Yusuf had kicked and punched her in her back and kidneys, there were no visible bruises on Wife's body in the photos. Wife opined that the bruises were not visible due to her "darker skin." Once the photos were introduced, the video was received as evidence and played for the jury.

¶15 Both Officer and Detective testified briefly for the State consistently with the facts outlined above. Officer recounted his investigation and observations of the scene. Detective testified about his phone call with Yusuf, and a recording of the call was then admitted into evidence and played for the jury.

¶16 With the help of an interpreter, Yusuf testified in his own defense. Yusuf's account of events was markedly different from Wife's. Yusuf testified that on the night of the incident, he went downstairs to use the bathroom and found Wife mopping the floor. Yusuf stated that he told Wife he wanted to mop instead of her because she was pregnant and had other children to care for. Yusuf claimed that Wife became angry and told him that what she really needed was additional money to cover the household expenses. Yusuf reportedly told Wife that he could not afford to give her more money. According to Yusuf, Wife began to hit him with the broom handle, and he put his hands up to protect himself. Yusuf stated that he asked Wife to "calm down" but she continued to hit his hands with the broom until it broke, which he claimed left him with a scar. Yusuf said that Wife then walked away from him. Yusuf reported that at this point he tried to leave the house, but as he was retrieving his keys, he looked back and

saw Wife fall. Yusuf explained that he then decided to go back and help Wife stand up, but as he was doing so Wife purposely grabbed his coat, which made it hard for him to breathe. Yusuf then took off his shirt and left the house.

¶17   Yusuf was also questioned regarding his interview with Detective. Yusuf testified that it was "hard" for him to understand Detective's questions because his understanding of English is only "50/50." Moreover, Yusuf stated that it was likewise "hard" for Detective to understand his answers because it is difficult for him to answer in English. Yusuf admitted that although he told Detective that Wife "was angry and she beat [him] up," he did not tell Detective about the broom. Yusuf also denied having a knife, kicking Wife, or trying to pull Wife's eyes out. And during cross-examination, Yusuf admitted that, prior to trial, he had not told anyone about the broom, his injuries, or his scar.

¶18   Before closing arguments, Yusuf's counsel asked the district court to not allow the jury to have access to the video during deliberations. Among other things, he argued that allowing the jury to "continually" rewatch the video during deliberations would place "undue emphasis" on Wife's account and would "bolster her testimony." The court disagreed, ruling that the video could go back with the jury during deliberations.

¶19   In closing, the State focused on the issue of credibility. It argued that Yusuf's version of events had changed over time and that neither version "ma[de] sense," whereas Wife's version "matched" the version recounted by both Officer and Detective. The State also asserted that Wife's account was consistent with the physical evidence, including her injuries depicted in the photographs from the night of the incident.

¶20   Yusuf's counsel argued in closing that the purported inconsistencies between Yusuf's interview with Detective and Yusuf's testimony at trial were due to the obvious language

barrier and that, in any event, the accounts were not that inconsistent because Yusuf had consistently maintained that he "was attacked." Regarding the photographs, Yusuf's counsel noted the lack of visible bruising on Wife's body and argued that Wife's "flushed" face and the "[s]cratches on [her] arm" were not injuries consistent with the "very egregious attack" that Wife had described. Yusuf's counsel concluded that, based on these deficiencies, the State had not proven its case beyond a reasonable doubt.

¶21 The jury spent approximately four hours in deliberation. During this time, the jury sent the following question to the district court: "Did [Wife] see the video prior to her testimony? (In preparation for the trial.)" The court declined to answer the question, telling the jury that it "must rely on the evidence presented in the trial."

¶22 The jury convicted Yusuf as charged, and Yusuf timely appealed.

ISSUE AND STANDARD OF REVIEW

¶23 Yusuf argues the district court improperly admitted the video into evidence.[3] "A district court's decision to admit or exclude evidence is generally reviewed for an abuse of discretion, unless it involves a legal question, which is reviewed for correctness." *McKelvey v. Hamilton*, 2009 UT App 126, ¶ 17, 211 P.3d 390. "A court abuses its discretion when it applies the wrong legal standard or when its decision to admit or exclude evidence

---

3. Yusuf raises additional claims, all of which concern the district court's handling of the video. We need not reach the merits of these additional claims, however, because our conclusion that the video was inadmissible is dispositive.

is beyond the limits of reasonability." *State v. Rallison*, 2023 UT App 34, ¶ 7, 528 P.3d 1235 (quotation simplified).

ANALYSIS

I. Admitting the Video into Evidence

¶24   The district court denied Yusuf's motion in limine to exclude the video as hearsay on two grounds. First, the court ruled that the video was not hearsay and was admissible as "a prior consistent statement" pursuant to rule 801(d)(1)(B) of the Utah Rules of Evidence. Second, the court ruled that the motion was "untimely." Yusuf contends both rulings were in error.

¶25   As to the district court's first stated ground for denying Yusuf's motion in limine—that the video was admissible as "a prior consistent statement"—the State concedes that the court's ruling was infirm. "Rule 801(d)(1)(B) permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive." *State v. Bujan*, 2008 UT 47, ¶ 8, 190 P.3d 1255 (quotation simplified). But here, Yusuf did not make any claim of recent fabrication or improper influence on Wife. The court therefore committed legal error in concluding that the video was admissible on this basis.[4]

---

4. The State suggests that the district court could have admitted the video as "not hearsay" because the video was being offered to show Wife's physical condition after the crime and the layout of the house. But this suggestion is belied by the fact that neither purported reason depends on the audio of the video, which was the basis for Yusuf's hearsay objection. Indeed, Yusuf expressly

(continued…)

¶26 Turning next to the district court's alternative basis for denying Yusuf's motion in limine—that the motion was "untimely"—we conclude that the court abused its discretion in denying the motion on this ground.

¶27 The district court's pretrial scheduling order set September 15, 2023, as the deadline for filing any motions in limine. Yusuf did not file any motions in limine by this deadline. However, on November 7, immediately before opening statements, Yusuf moved to exclude the video. After listening to arguments and ruling on the merits, the court noted that Yusuf's motion was also "untimely." On the facts of this case, this ruling was "beyond the limits of reasonability." *State v. Rallison*, 2023 UT App 34, ¶ 7, 528 P.3d 1235 (quotation simplified).

¶28 "Trial courts have broad discretion to manage their dockets and set firm deadlines for motion practice." *State v. Gonzalez*, 2015 UT 10, ¶ 48, 345 P.3d 1168 (quotation simplified). Rule 12(f) of the Utah Rules of Criminal Procedure "provides that a defendant's failure to comply with the court's deadline constitutes a waiver of the unraised issue, although the district court may allow relief from such waiver for good cause shown." *State v. Bergeson*, 2010 UT App 281, ¶ 3, 241 P.3d 777. "[T]he district court has considerable discretion to determine whether a litigant has demonstrated good cause to file a motion after a deadline is missed." *Id.* ¶ 7. However, once a court excuses a defendant's waiver by entertaining an untimely motion on the

---

indicated that he did not object to playing the video for the jury without audio. Moreover, the layout of the house is immaterial to the relevant issue, which is who was the perpetrator in the assault. Neither party contested what the room looked like or where the altercation occurred, nor do these details bear on either party's version of events.

merits, the court cannot then deny the motion as untimely. *See id.* ¶¶ 7–8.

¶29    In this case, the district court did exactly that. Before raising his untimely motion in limine, Yusuf's counsel asked the court how it would like to handle the motion. The court indicated that it wanted to consider the motion before trial, rather than dealing with an objection during trial when the video was introduced. Thereafter, the State reminded the court that Yusuf's motion was untimely pursuant to the pretrial scheduling order, to which the court responded that it was aware and that it wanted to consider "the substance" of the arguments. Because the court was well aware that Yusuf's motion was untimely yet nonetheless elected to consider the motion on its merits rather than summarily dismissing it on that basis, the court abused its discretion in subsequently denying the motion to exclude on timeliness grounds.

¶30    For all the foregoing reasons, we conclude the district court abused its discretion in admitting the video into evidence.

## II. Harm

¶31    Having concluded that the district court improperly admitted the video into evidence, we next consider whether this error harmed Yusuf. *See State v. Fahina*, 2017 UT App 111, ¶ 28, 400 P.3d 1177 ("An evidentiary error cannot result in reversible error unless the error is harmful." (quotation simplified)). "An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant or our confidence in the verdict is undermined." *State v. Cegers*, 2019 UT App 54, ¶ 32, 440 P.3d 924 (quotation simplified). "When determining whether an alleged error was harmful, we consider such factors as the importance of the relevant [evidence], whether the [evidence] was cumulative, and the overall strength of the prosecution's case. The more evidence supporting the verdict, the

less likely there was harmful error." *Fahina*, 2017 UT App 111, ¶ 29 (quotation simplified).

¶32 Here, the evidence of Yusuf's guilt was inconclusive at best. The only physical evidence admitted at trial was the photographs of Wife's alleged injuries. While the State argued in closing that Wife's appearance—including her "disheveled" hair, red cheeks, "cut" nose, and "scratche[d]" body parts—supported Wife's version of events, Yusuf argued the exact opposite. In particular, Yusuf asserted that these alleged minor injuries were not consistent with the "very egregious attack" that Wife had described, and he further noted that the lack of visible bruising in the photographs supported his account that he did not kick or punch Wife in her back and kidneys. And while one of the more troubling aspects of Wife's account involved her claim that Yusuf wielded a knife during the altercation, that knife was never found, and the only cut on Wife's body—the small one on the bridge of her nose—was not caused by a knife.

¶33 Moreover, there was no eyewitness testimony from anyone who was present during the incident. Although three children observed the incident, none were called as witnesses at trial, and apparently they were not interviewed at all. And while Officer and Detective both testified at trial, neither was present during the incident, and therefore neither had independent knowledge of what went on. Given the lack of physical evidence and eyewitness testimony, this case was essentially a credibility contest between Yusuf and Wife. And given that Yusuf and Wife both testified to a physical altercation that night, the sole dispute at trial was whether the events unfolded in the manner articulated by Yusuf or by Wife.

¶34 In cases such as this, where there is very limited corroborating physical evidence or eyewitness testimony, Utah appellate courts have found prejudice where inadmissible evidence bolstered the account of one witness in a credibility

contest. *See, e.g.*, *State v. Plazola*, 2023 UT App 161, ¶ 31, 542 P.3d 559 (concluding that the wrongful admission of a victim's prior statements was harmful where, among other things, there was no physical evidence or eyewitness testimony supporting the alleged victims' accounts); *State v. Bujan*, 2006 UT App 322, ¶¶ 31–32, 142 P.3d 581 (concluding that the admission of hearsay testimony was prejudicial where the "testimony provided the only corroboration of [the victim's] alleged rape"), *aff'd*, 2008 UT 47, 190 P.3d 1255. We reach the same conclusion here. Allowing the jury to view the video during trial worked to bolster Wife's in-court testimony because Wife's account in the video was essentially the same as her live testimony, albeit the statements in the video were not relayed through an interpreter.[5]

¶35    And even more than that, this problem was then compounded by allowing the video into the jury room during deliberations. "The video recording is the functional equivalent of

---

5. The State contends that any error in admitting the video was harmless and therefore not grounds for reversal because Wife's statements to Officer in the video "were merely cumulative of her testimony at trial." In support of this argument, the State cites a number of cases holding that the admission of improper testimony is harmless where the "testimony was merely cumulative to that already testified to." (Quoting *State v. Thomas*, 777 P.2d 445, 450 (Utah 1989).) Here, however, the video was not merely cumulative of Wife's trial testimony. Although Wife's story itself may have been consistent between the two accounts, the video offered details that were not part of her trial testimony, such as Wife reenacting the assault on one of her young sons while describing it in clear, understandable English, rather than through an interpreter. Because this detail offers something "new or additional to the evidentiary picture," the video is not "merely cumulative" testimony. *State v. Flores*, 2024 UT App 195, ¶ 31, 562 P.3d 1203 (quotation simplified).

a live witness, and can be particularly persuasive." *State v. Cruz*, 2016 UT App 234, ¶ 39, 387 P.3d 618 (quotation simplified). Providing the jury unfettered access to the video during deliberations unduly emphasized Wife's account and was "tantamount to having [Wife] testify a second time." *See id.* (quotation simplified).[6]

## CONCLUSION

¶36 The district court improperly admitted the video into evidence. The court abused its discretion in concluding that the video was admissible as a prior consistent statement and in ruling that Yusuf's motion to exclude the video was untimely. Because this error harmed Yusuf, we vacate his convictions and remand the matter for a new trial.

———

6. Although there is no way to definitively know whether the jury viewed the video during deliberations, the jury did inquire about the video. As this court recently recognized, juror questions can indicate that certain "evidence was an important part of the trial." *State v. Gourdin*, 2024 UT App 74, ¶ 92, 549 P.3d 685, *cert. granted*, 564 P.3d 958 (Utah Jan. 29, 2025) (No. 20240871).