2026 UT App 52

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DAMIEN MICHAEL DRAUGHON,
Appellant.

Opinion
No. 20240514-CA
Filed April 2, 2026

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 211910521

Nathalie S. Skibine, Attorney for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Damien Michael Draughon married a woman who had two children from a prior relationship. He subsequently developed what he acknowledged was an inappropriate relationship with one of those children, a thirteen-year-old girl we'll refer to as Sarah. One day, Sarah's mother found incriminating text messages between Draughon and Sarah. Authorities investigated the matter and charged Draughon with six counts of child sexual abuse, two counts of dealing in materials harmful to a minor, and one count of obstruction of justice. A jury convicted Draughon on all of the charges aside from one of the sexual abuse counts, which the State dropped prior to trial. He now challenges those convictions on appeal by raising several

issues, including that Sarah's testimony was inherently improbable and that his trial counsel was ineffective in failing to object to the introduction of a recording of a problematic telephone conversation between Draughon and Sarah's mother. We reject all of his claims and affirm his convictions.

BACKGROUND[1]

*The Abuse*

¶2     Draughon married Sarah's mother (Mother) in 2017 when Sarah was nine years old. Mother also had another child (Brother) from the previous relationship, and Draughon and Mother subsequently had a child of their own. Sarah's relationship with her biological father had deteriorated over the years, and she came to view Draughon as her "real dad." According to Sarah, Draughon was "there for [her]" and would help her with "school stuff." Although Mother initially believed the relationship between Sarah and Draughon was "a good thing," she started feeling uneasy with it as Draughon became "openly more affectionate" with Sarah and as the two "spent more and more time together." When Mother told Draughon that she was uncomfortable with the nature of his relationship with Sarah, Draughon "pushed back that [the] relationship was normal."

¶3     When Sarah was twelve or thirteen years old, Draughon began touching her "in inappropriate ways." On one occasion, Sarah was washing dishes when Draughon, who had been cooking, walked up behind her, placed "his hands under [her]

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Barlow*, 2025 UT App 152, n.2, 579 P.3d 422 (cleaned up).

shirt," and touched her breasts with "two of his fingers." This encounter lasted five minutes until Brother "walked in," at which point Draughon "took his hands out of [Sarah's] shirt slowly and just went back to cooking." Neither Draughon nor Brother said anything at the time. We refer to this as "the First Kitchen Incident."

¶4    On another occasion, Sarah was washing dishes again when Draughon, who had again been cooking, "touched [her] butt over [her] shorts." He stood there talking to Sarah while holding his hand "directly over [her] butt cheek." Sarah felt like she couldn't move because Draughon was "directly behind" her. The touching stopped when Draughon walked away and resumed cooking.

¶5    On still another occasion, Draughon had his hand on Sarah's breast over her shirt while they were sitting on a recliner and watching a television show. We refer to this encounter as "the Recliner Incident."[2]

¶6    Most nights, the family would watch shows in Draughon's bedroom before bed. On one of those occasions, Sarah and Draughon were lying on the bed under a blanket when he "put his hand under [Sarah's] shorts and underwear and . . . over [her]

---

2. When the State asked Sarah about the Recliner Incident at trial, she initially testified that she didn't remember a time other than the First Kitchen Incident and another, uncharged incident that occurred on another occasion when the family was watching a show in Draughon's bedroom and Draughon touched Sarah's breasts. When the State began asking her about the Recliner Incident, Sarah said that Draughon had touched the underwire of her bra while they were sitting on the recliner and then "put his hand on [her] butt." The prosecutor then refreshed Sarah's recollection under rule 803(5) of the Utah Rules of Evidence, after which Sarah testified to the facts stated above.

butt cheek" and squeezed "[r]eally hard" for thirty minutes. Sarah was "scar[ed]," "really uncomfortable," and "really out of [her] safe place." Draughon temporarily stopped when Sarah shifted her body but would resume after Sarah finished moving. The touching stopped when Sarah got up and went to bed. Draughon did not say anything to Sarah during this encounter.

¶7 Draughon frequently touched Sarah's buttocks on other occasions when the family watched shows before bed, although she largely couldn't remember the "specifics" of these encounters. But she did remember that Draughon would touch her both over and under her clothes and apply significant pressure. The encounters would end either when she'd shift her body or Draughon "would randomly stop."

¶8 On another occasion, Draughon had taken Sarah to work with him, and the topic of pornography came up. Sarah told Draughon that she was "interested" in watching pornography. Draughon then shared three pornographic videos with Sarah, two of which she watched and the other she did not.

*Mother Discovers Incriminating Text Messages and Confronts Draughon*

¶9 One day, Mother was in the kitchen when she had a "gut feeling to open [Draughon's] iPad." Mother became "immediately concerned" when she saw messages in which Draughon had asked Sarah whether "she was naked," "what she was doing," whether "she enjoy[ed] that," and how had she felt when she "watched that." Mother took photos of some of the text messages and then called Draughon. He denied showing Sarah pornography. Believing that Draughon was "gaslighting" her, Mother hung up the phone. A few minutes after Mother ended her conversation with Draughon, Sarah walked into the kitchen. Mother asked Sarah whether Draughon had shown her

"pornography the last two days." Sarah acknowledged that Draughon had done so.

¶10   Later that day, Mother was at work when she texted her friend (Friend), saying that she needed help. Mother texted the photos of the messages to Friend, who responded by asking Mother where she was. When Mother responded that she was at work, Friend told her that she needed to go home. Mother then scheduled an "emergency appointment" with her counselor, and she meant to call the counselor when she left work. Instead, she "went into muscle memory and accidentally called" Draughon, whose calls she had been ignoring since their conversation earlier in the day. Draughon stated that what Mother saw was part of a "normal father/daughter relationship." Mother responded, "This is not normal. This is not okay. Do not come home." Mother drove home, where she met Friend. She also asked Sarah whether anything else had happened with Draughon besides the pornography. Sarah said, "No."

¶11   Mother then called both Child Protective Services (CPS) and the local police department to report the incident. She also shared the photos of the text messages with Draughon's father and asked him to retrieve Draughon's belongings from the house. Throughout that night, Draughon asked to speak with Mother. She decided that when she was ready, she would give Draughon ten minutes to "explain himself."

¶12   With Friend present, Mother eventually called Draughon with the speakerphone activated. During the conversation, Draughon admitted to showing Sarah pornography. Mother told Draughon that she had reported the incident to CPS but not the police. Draughon stated that what he "did was a felony," and he indicated that he had contacted a lawyer. The following exchange also occurred:

*Draughon*: I fucked up, you know. I'm so sorry that I did, but I did. I'm so sorry. I love you so much. I love our kids so much. Everything I did was wrong and I'm sorry.

*Mother*: Yeah. But then [Sarah] came back and said that you were talking to her while she was watching [one of the pornographic videos] and asking her how she felt and how her body felt . . . .

*Draughon*: I know . . . everything was inappropriate.

*Mother*: So you have attractions to [Sarah]?

*Draughon*: They're complex.

*Mother*: No. You can be honest right now.

*Draughon*: This is all to be talked through therapy.

*Mother*: You can't be honest with me right now?

*Draughon*: I never was attracted to [Sarah].

*Mother*: Yes, you were. You told her in the sauna multiple times.

*Draughon*: Until—no, no, listen to me. I never was attracted to her until she went through puberty, but I had never, ever—thank you for finding out before anything worse happened. Thank you.

*Mother*: Was something worse going to happen?

*Draughon*: No. Obviously, I was out of my control. I am sick, obviously. I (inaudible) so sorry. I don't know what to say or do.

. . . .

*Mother*: So how long has this been going on?

*Draughon*: What?

*Mother*: The inappropriateness between you two, asking her if she is naked.

*Draughon*: A couple weeks. It's not like I [sought] it out. . . .

*Mother*: [Y]ou did too . . . . There's multiple times in there. Don't. If you want to be honest—

. . . .

*Draughon*: I'm telling you. I'm telling you.

*Mother*: I am telling you, I read your messages. You're asking her if she is naked. You are asking her if she took her clothes off because I left for work. You're initiating and asking things.

*Draughon*: I know it looks a lot worse. It's not—

*Mother*: No, it is a lot worse. It's not that it looks a lot worse. There is no way around that. There is no way to take out context. You're specifically asking her inappropriate things.

*Draughon*: I know. I know I'm wrong. I was wrong. I don't know what to do.

. . . .

*Draughon*: I don't know what you want me to say.

*Mother*: I don't know. I want you to be honest.

*Draughon*: I am being honest . . . .

*Mother*: So, you've been attracted to [Sarah] since she went through puberty?

*Draughon*: No, no. I'm not attracted to her all the time.

*Mother*: You just said that.

*Draughon*: I said that was when it started, but . . . it's not like I'm sexually attracted to her. It's hard to explain.

*Mother*: Yes, you are.

*Draughon*: No, I'm not. I don't want to have sex with our daughter. It's a much more nuanced thing. It's not. I don't want to have sex with our daughter . . . .

*Mother*: So what is it, . . . because you were taking steps towards that. You were grooming her. Your dad confirmed that from reading the text messages.

*Draughon*: Thank you for just involving everyone in the world before talking to me.

. . . .

*Mother*: So what's the nuance behind it?

*Draughon*: It's not like I covet our daughter. I love her deeply, just like I love you, and then the other (inaudible)—

*Mother*: [Y]ou put more sexual attention towards our daughter than me, also. So you covet her like what?

*Draughon*: I don't covet her.

*Mother*: You just said that.

*Draughon*: I don't want to have sex with our daughter. I said, "It's not like I covet our daughter." I don't.

. . . .

*Mother*: I want to know what else has been going on. What [is] CPS going to find? You have an opportunity to be honest and open with me.

*Draughon*: Nothing.

*Mother*: Before I find something from them.

. . . .

*Mother*: [I]s there anything else? Any more conversations like that? Anything else that's going to come up that you haven't been forthright about or/and I haven't found?

*Draughon*: No, you won't. I have not done anything other than what we've talked about already.

*Mother*: What about all the times you cuddled?

*Draughon*: No.

*Mother*: You said you were excited to come home . . . , and I was at work for you two to have alone time. You said that to her.

*Draughon*: That's completely harmless. It was not sexual.

*Mother*: No, it's not harmless because you were coming home to put porn on for [Sarah], so it's not harmless.

*Draughon*: That happened on Monday and Tuesday and I already told you about that.

*Mother*: Yes, . . . you told me after I found it.

*Draughon*: I know. I was honest about it.

*Mother*: [Y]ou weren't. You said you weren't trying to hide it.

*Draughon*: I didn't hide it once you asked me about it.

*Mother*: So why—it excited you to come home and have alone time to put porn on for her, correct?

*Draughon*: No.

*Mother*: You—that's what you said to her.

*Draughon*: It didn't excite me.

*Mother*: You said that to her. So you're going to have to be honest with yourself. You're going to have to be honest with me also.

*Draughon*: I'm being honest with you.

*Mother*: Is there anything else you need to say?

. . . .

*Mother*: This is, like, an emotional, sexual affair on our marriage. And I've been communicating to you for weeks that I felt like your relationship was inappropriate about the cuddling. Like, it's been an ongoing thing and you still pressed forward through it.

*Draughon*: I'm not sexually attracted to our daughter. I love her deeply.

*Mother*: You just disregarded everything I said to you . . . .

*Draughon*: I'm not sexually attracted to her.

*Mother*: That's not what I said to you . . . .

*Draughon*: You told me that you thought it was . . . inappropriate and I agree.

*Mother*: [A]ll the cuddling and the relationship, I've been telling you for weeks I felt that was inappropriate.

*Draughon*: I said I'm sorry. Like I said, I'm sorry.

. . . .

*Draughon*: (inaudible) doesn't matter what I say to you. You've already decided in your head and I understand that. I failed you and I'm sorry.

*Mother*: Yeah, but I've been trying—

> *Draughon*: [T]he cuddling was innocent. I'm telling you there was no sexual—
>
> *Mother*: [N]o, but it's all a step closer towards what's been going on.
>
> . . . .
>
> *Mother*: Why when I'm telling you I can see things and have a gut feeling that things are going on and going in the wrong direction, why can't you listen to me? Why did you just disregard me, and treat me like I'm stupid, and that I was crazy, and I'm imagining things?
>
> *Draughon*: Because I'm ill, obviously. I'm a bad person . . . . I'm a bad person. I treated you terribly. You didn't deserve it.

After the phone call ended, Friend revealed to Mother that she had recorded most of the conversation, and she shared a copy of the recording with Mother. The day after the conversation, Draughon performed a factory reset of the iPad.

### Draughon Is Arrested and Charged

¶13    The authorities investigated the allegations, and Sarah apparently retreated from her initial denial, disclosing to police that Draughon had inappropriately touched her on several occasions. Draughon was arrested three months after Mother discovered the incriminating text messages on his iPad, and he was initially charged with six counts of aggravated sexual abuse of a child, one count of obstruction of justice, and two counts of dealing in materials harmful to a minor. The obstruction charge was based on his factory reset of the iPad, and the harmful materials charges were related to the pornographic videos that he shared with Sarah. Prior to trial, one of the sex abuse charges was

dropped, and the remaining five corresponded with the incidents already described. *See supra* ¶¶ 3–7.

*Draughon Is Convicted on All Counts*

¶14    The case proceeded to a jury trial. At the beginning of the trial, the court read the charging document to the jury. In so doing, the court informed the jury of the classifications for each of the eight counts. Thus, the jury was told that Draughon was charged with five first-degree felonies, one second-degree felony, and two third-degree felonies. Draughon's trial counsel (Counsel) did not object to the references to the classifications of the offenses.

¶15    The State called eight witnesses, including Sarah, Mother, Brother, and a forensic psychologist (Expert). The witnesses testified to the events noted above.

¶16    In addition, Sarah testified about other uncharged incidents to the jury. She described incidents similar to the conduct underlying the charges. She also testified that when she was thirteen years old, Mother bought her a dildo at Draughon's urging. Draughon would ask Sarah if she "had tried new things" or "wanted to learn how to do things" with the dildo. On one occasion he used the dildo to teach her "how to do a blow job . . . and then a hand job" in her room. During this encounter, Draughon lay on the bed, put the dildo "on his groin area," and had Sarah place the dildo in her mouth and "go up and down on it." This lasted about one minute. Draughon then had Sarah place her hands on the dildo, which was "[s]till on his groin," and move her hands "up and down." Draughon then told Sarah that if she "can make a man come, then [she's] in charge."

¶17    Sarah also testified that, on at least one other occasion when she was thirteen, she and Draughon were lying on his bed when he placed his hand under her shorts but over her underwear and touched her above her vagina. Sarah told Draughon that the

touching made her feel "really, really uncomfortable." Draughon then removed his hand from Sarah's shorts.

¶18 While Sarah was on the witness stand, the State further introduced a tranche of text messages that Draughon had sent to her.

- In one exchange, Draughon said, "Mom was grumpy last night. With you when I [was] joking around like we do." Sarah responded, "Yeah. She looked at me VERY judgmental when you told her I like to suck on my dildo." Draughon then said, "She is acting uptight about it. We need to not joke about it around her anymore, I guess. And/or even talk about any of that stuff anymore. Around her that is. We didn't do anything wrong. I'm sorry, I shouldn't of told her. It just slipped out."

- In another, Draughon stated, "Thank you for including me in all your sexuality issues. It means so much to me that you trust me enough to share it with me. I love you too much."

- In other messages, Draughon asked her about the dildo and referred to it by nicknames.

- On at least two occasions, Draughon texted Sarah about her being naked and alone at home.

- Draughon also texted Sarah about their "cuddles." Those texts included, "Wish I was at home with you. Cuddling."; "I love our cuddles."; and "I feel like I never get enough of your cuddles."[3]

---

3. Sarah testified that these "were the same cuddles that [Draughon] would touch . . . [her] breasts and [her] butt."

- Draughon frequently messaged Sarah to compliment her on how her "butt" looked. Those texts included, "Your butt looks really good in those shorts."; "Your butt always looks good though. Ha ha. Cutest little booty ever."; "Do you like swimming as much as you like . . . boys looking at your cute butt in your bikini?"; "I can't blame them you have the cutest butt in the world. Ha ha. They should have some common courtesy and look away though before you catch them staring."; "You do look GOOD in your bikini. Too good for a dad to comfortable."; and "Newsflash!! Your butt looks good in anything you wear."

- In still another exchange, Sarah said that she was "in pain." Draughon responded, "I am sorry wish I could help you. Or at least be there to give you a big hug and rub your butt."

- In another message, Draughon said, "The other day when . . . I walked up and kissed you on the lips, and you didn't make a weird noise and let me do it made my day."

- On another occasion, Draughon texted Sarah, "Mom has really nice nipples . . . . I am sure that you were going to have the same[.]"

- In yet another exchange, Draughon texted Sarah one morning asking how she slept. She responded, "I slept okay. I'm going to get in the bath to make my cramps go away. How did you sleep?" Draughon responded, "I slept really well except for the fact that I woke up once in the middle of the night with the Stiffy. Ha ha. I am sorry you have cramps."

¶19    The State then called Mother and introduced the recording of the phone call. Mother testified that, at the time, she did not know that Friend had been recording the call. Counsel did not object to any portion of the recording.

¶20　Brother testified that he walked into the living room one day and saw Draughon dancing with Sarah with his hands "cupped around" her "breast area." Brother testified that Draughon's hands were under Sarah's shirt but that he could not tell whether they were under her bra. Brother also stated that Draughon "kind of push[ed]" Sarah away and "walk[ed] into the kitchen" when Brother walked into the room. Brother also stated that the family gathered "nearly every night" to watch a television show or a movie and that Draughon and Sarah would frequently cuddle together, with Draughon occasionally "caressing [Sarah's] thigh or her butt."

¶21　Expert testified as a "blind expert," which he defined as "someone who doesn't know any of the facts of a given case." He explained that his job was to provide the jurors with information that they "may or may not find useful as they consider the facts of the case." Among other things, Expert discussed grooming, which he defined as "a pattern in which a person who is reported to have abused somebody takes steps to reduce resistance or inhibition from the person reported being abused." He offered various examples of grooming behaviors, including giving the abused child toys and treats, facilitating "incidental touch" with the child, and otherwise "expos[ing] the child to sexually explicit content." Counsel did not object to Expert's grooming testimony.

¶22　After the State rested its case, Draughon called four witnesses, including his father and himself. Draughon's father testified that he had worked in law enforcement for forty years before retiring and, for most of that time, one of his primary responsibilities was investigating crimes against children. On cross-examination, Draughon's father acknowledged that he had spoken with Mother on the day she found the incriminating text messages on Draughon's iPad, but he stated that he had "no recollection" of telling her that Draughon's conduct "sounded like grooming."

¶23   For his part, Draughon admitted showing Sarah pornography.[4] He also conceded that most of the text messages were authentic, aside from one in which he was alleged to have said, "I can't wait to come home and rub your butt." He also acknowledged that the text messages had gotten "worse and worse" and that they were "wrong" and "inappropriate," but he did try to explain that those messages were part of "an open dialogue about [Sarah's] puberty and the development of her body." He also admitted kissing Sarah on the lips but stated that it was a "peck" to say, "I love you," and wasn't sexual. Draughon similarly denied that he had inappropriately touched Sarah or that he made her place her hands and mouth on the dildo while he was holding it to his groin.

¶24   After Draughon testified, the defense rested. Counsel then moved for a directed verdict on the sexual abuse counts, arguing as follows:

> [T]he State has alleged certain conduct with respect to each count, hand on breast while on the recliner, hand on breast in the kitchen, hand on the butt in the kitchen—defendant's bed. [Sarah] testified to much different conduct than that. Her brother testified to even a third level of contact that was not established by any of these counts. So I don't believe that there is sufficient evidence for any of Counts 1 through 5 for which a reasonable jury could find a conviction . . . because we're just all over the place in terms of what happened and when and where. And that's the basis of my motion.

---

4. Indeed, during opening argument, Counsel had conceded that there was sufficient evidence to convict Draughon on the two dealing-in-harmful-materials counts.

The court denied the motion, ruling that there was enough evidence to send each count to the jury. The jury convicted Draughon on all eight counts, and the district court later sentenced him to prison.

## ISSUES AND STANDARDS OF REVIEW

¶25 Draughon appeals, raising numerous issues. First, he argues that the district court erred in denying his motion for a directed verdict because (1) Sarah's testimony was inherently improbable and (2) the evidence related to the Recliner Incident was insufficient. "We review the district court's denial of a motion for directed verdict for correctness." *State v. Hofeling*, 2025 UT App 180, ¶ 14, 582 P.3d 1263 (cleaned up), *petition for cert. filed*, Feb. 11, 2026 (No. 20260176). Nonetheless, we defer to a "court's ability and opportunity to evaluate credibility and demeanor" and will reverse a "court's decision to decline to disregard a witness's testimony due to inherent improbability . . . only if it was clearly erroneous." *State v. Skinner*, 2020 UT App 3, ¶ 20, 457 P.3d 421 (cleaned up). Similarly, when addressing a general sufficiency of the evidence challenge to a court's denial of a directed verdict, we will sustain the ruling "if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime have been proven beyond a reasonable doubt." *Hofeling*, 2025 UT App 180, ¶ 14 (cleaned up).[5]

¶26 Draughon also asserts that Counsel was ineffective for (1) failing to move to suppress all or part of the phone call between Draughon and Mother and (2) not objecting to Expert's testimony

---

5. On his inherent improbability argument, Draughon argues in the alternative that Counsel was ineffective in failing to argue that the evidence was inherently improbable to support his convictions.

on grooming. He further maintains that the district court plainly erred when, during opening instructions, it informed the jury that the child sex abuse counts were first-degree felonies. "Claims for plain error and ineffective assistance of counsel present questions of law, which we determine in the first instance as a matter of law." *State v. Thomas*, 2025 UT App 145, ¶ 15, 579 P.3d 416 (cleaned up).

¶27 Finally, Draughon argues that he was prejudiced by the combined effect of each of the asserted errors. On a claim of cumulative prejudice, "we apply the standard of review applicable to each underlying claim of error." *State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844 (cleaned up).

ANALYSIS

I. Directed Verdict

¶28 Draughon argues that the district court erred in denying his motion for a directed verdict because (1) Sarah's testimony was inherently improbable and (2) the evidence was insufficient to convict on the count related to the Recliner Incident. As we explain below, Draughon failed to preserve his inherent improbability argument, so we address that issue under an ineffective assistance of counsel standard. Draughon's general sufficiency argument simply fails on its merits.

A. Inherent Improbability Argument

1. Preservation

¶29 When Counsel moved for a directed verdict, he argued in general terms that the evidence wasn't sufficient to support any of the child sexual abuse charges. The State argues that this wasn't enough to preserve Draughon's inherent improbability argument

under our caselaw. Draughon pushes back, arguing that "where it was undisputed that [Sarah] made the allegations and the only issue was credibility, the court would have understood" that the motion raised inherent improbability because Counsel argued "that the testimony was inconsistent and all over the place in terms of what happened." We agree with the State that the inherent improbability argument was not preserved.

¶30　"An appellant must properly preserve an issue in the district court before it will be reviewed on appeal." *Cove at Little Valley Homeowners Ass'n v. Traverse Ridge Special Service Dist.*, 2022 UT 23, ¶ 23, 513 P.3d 658 (cleaned up). A party preserves an issue by presenting it in a way that enables the district court to rule on it. *See, e.g., State v. Doyle*, 2018 UT App 239, ¶ 13, 437 P.3d 1266. Although "the preservation analysis does not turn on the use of magic words or phrases," *Scott Anderson Trucking Inc. v. Nielson Constr.*, 2020 UT App 43, ¶ 23, 462 P.3d 822 (cleaned up), an issue must nonetheless be "timely" and "specifically" raised and be supported with "evidence or relevant legal authority" in the proceedings below, *State v. Gallegos*, 2018 UT App 112, ¶ 14, 427 P.3d 578 (cleaned up). "In the context of inherent improbability, we have repeatedly clarified that a defendant who wants a trial court to disregard a witness's testimony under [*State v. Robbins*, 2009 UT 23, 210 P.3d 288,] before, or in connection with, undertaking a sufficiency-of-the-evidence review must make that request known to the trial court so that the court has an opportunity to rule on the issue." *State v. Hernandez*, 2025 UT App 90, ¶ 24, 572 P.3d 1156 (cleaned up), *cert. denied*, 574 P.3d 524 (Utah 2025).

¶31　Here, Counsel did not argue that Sarah's testimony was "inherently improbable," at least "as that term is understood under Utah precedent," *see id.*, namely, that Sarah's testimony was "so counter to human experience" that it was "inappropriate for consideration in sustaining a finding of guilt," *see State v. Jok*, 2021 UT 35, ¶ 36, 493 P.3d 665 (cleaned up). Nor did Counsel cite

*Robbins* or any other authority to indicate that he was making an inherent improbability argument.

¶32 Counsel did argue that Sarah recounted "much different conduct" from the allegations underlying the charges. While Sarah testified to *additional, uncharged* conduct, she also testified to the conduct underlying each charge. Consequently, there was nothing in Counsel's argument suggesting that Sarah's testimony was inherently improbable as it related to the charged offenses.

¶33 Counsel also argued that Brother's testimony related to a "third level of contact that was not established by any of [the charged] counts." In other words, Counsel suggested that Brother's testimony had no bearing on any of the other charges. Again, Counsel did not argue that Brother's testimony rendered Sarah's testimony about the charged conduct inherently improbable.

¶34 And in none of these instances did Counsel argue that Sarah's testimony should be disregarded in the district court's sufficiency analysis. For all these reasons, we conclude that Draughon did not preserve his inherent improbability argument for appeal.

2.  Ineffective Assistance of Counsel

¶35 Draughon argues in the alternative that it was objectively unreasonable for Counsel not to assert a directed verdict motion under the inherent improbability doctrine because Sarah's "testimony was so inherently improbable that no reasonable juror could have believed it beyond a reasonable doubt." We are not persuaded.

¶36 "A defendant asserting ineffective assistance of counsel must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient

performance resulted in prejudice." *State v. Chase*, 2025 UT App 158, ¶ 43, 580 P.3d 421 (cleaned up), *cert. denied*, 581 P.3d 560 (Utah 2025). And where the defendant fails to establish one of the prongs, we can dispose of the claim on that basis without addressing the other prong. *Id.* Here, we elect to address Draughon's argument on the deficient performance prong.

¶37 Establishing deficient performance requires a defendant to show that counsel failed to provide representation that was "within the wide range of reasonable professional assistance." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). And where a motion for a directed verdict would be futile, counsel has no obligation to raise it. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025. The question that must be resolved is whether counsel's decision "was that of a reasonable, competent lawyer in the real-time context of a trial." *State v. Arce*, 2024 UT App 43, ¶ 34, 547 P.3d 235 (cleaned up). Stated otherwise, a "court must always base its deficiency determination on the ultimate question of whether counsel's act or omission fell below an objective standard of reasonableness." *State v. Ray*, 2020 UT 12, ¶ 36, 469 P.3d 871.

¶38 In *State v. Robbins*, our supreme court explained that "a conviction not based on substantial reliable evidence cannot stand." 2009 UT 23, ¶ 14, 210 P.3d 288 (cleaned up). Although a court is generally bound by "the jury's determination of witness credibility," it has the discretion to disregard such testimony when it is "inherently improbable." *Id.* ¶ 16. In *State v. Jok*, the supreme court acknowledged that three factors have "merited consideration under an inherently improbable analysis: material inconsistencies, patent falsehoods, and lack of corroborating evidence." 2021 UT 35, ¶ 32, 493 P.3d 665. The court nonetheless cautioned against "inflexible reliance" on those factors and clarified that "the proper test is, and always has been, whether reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *Id.* (cleaned up). The court

explained further that for testimony to be disregarded under the inherent improbability doctrine, it "must run so counter to human experience" when considered "in light of the other evidence" that it would be "inappropriate for consideration in sustaining a finding of guilt." *Id.* ¶ 36 (cleaned up).

¶39 Draughon argues that the testimony was inherently improbable because it "included the kind of inconsistencies that make it counter to human experience." (Citing *State v. Prater*, 2017 UT 13, ¶ 39, 392 P.3d 398.) In support, Draughon points to Sarah's initial denial that anything happened other than what Mother had found when she discovered the text messages on the iPad. Draughon argues that Mother's response to the discovery "created a motivation for [Sarah] to fabricate" the cuddling or otherwise "recontextualize[] the cuddling" into something sexual. For either of these reasons, Draughon argues, Sarah could have retreated from her initial denial.

¶40 Draughon's explanations for Sarah's recantation are certainly *plausible*. But Sarah's testimony does not "run so counter to human experience" as to make it "inappropriate for consideration in sustaining a finding of guilt." *See Jok*, 2021 UT 35, ¶ 36. Indeed, Sarah testified to the conduct underlying each of the five sexual abuse counts. And although the *Jok* court warned against a formulaic application of the factors identified by *Robbins* and its progeny, *see id.* ¶ 32, "[c]ourts are still allowed—and perhaps even encouraged—to examine" those factors in an inherent improbability analysis, *State v. Barnes*, 2023 UT App 148, ¶ 24, 542 P.3d 108.

¶41 For testimony to be materially inconsistent under the inherent improbability doctrine, it must be "internally inconsistent." *State v. Carrell*, 2018 UT App 21, ¶ 53, 414 P.3d 1030. Indeed, "[t]he mere fact that a witness's account changes between her initial interview with police and her testimony at trial is by itself insufficient." *Id.* Although Sarah initially denied that she

was abused by Draughon, she was consistent in her testimony throughout trial that Draughon abused her. Thus, Sarah's testimony was not materially inconsistent. *See id.*

¶42 "Testimony is patently false" under the inherent improbability doctrine "only when it is physically impossible or self-evidently false." *State v. Dever*, 2022 UT App 35, ¶ 41, 508 P.3d 158 (cleaned up). Draughon does not argue that Sarah's testimony was physically impossible, nor could he. *See, e.g., State v. Estes*, 2025 UT App 10, ¶ 27, 564 P.3d 239 ("Testimony is physically impossible when what the witness claims happened could not have possibly occurred." (cleaned up)), *cert. denied*, 568 P.3d 261 (Utah 2025). Nor was Sarah's testimony self-evidently false. For one thing, a transitory denial does not render a subsequent allegation patently false. Such an inconsistency would be for the jury to consider in making its credibility determination. *See, e.g., Dever*, 2022 UT App 35, ¶ 41 ("The question of which version of the witnesses' stories is more credible is the type of question we routinely require juries to answer." (cleaned up)); *Carrell*, 2018 UT App 21, ¶ 53 (explaining that a witness's shifting story, on its own, is not enough to disregard the jury's credibility findings as to that witness). Draughon suggests that Sarah's testimony was patently false because she was "unable to remember the details of her allegations" even after Mother had given her "a journal so she could better remember and document her allegations." For instance, Draughon claims that Sarah failed to remember the specific details about the Recliner Incident other "than that it happened." Similarly, Draughon argues that Sarah's testimony that he frequently touched her on his bed was devoid of details. While these points might have been effective on cross-examination, they in no way compel a conclusion that anything in the challenged testimony was patently false. There is nothing in such testimony that renders it patently false under the inherent improbability doctrine.

¶43    Finally, if the State has offered evidence to corroborate "at least some of the details of the witness's story," an inherent improbability argument will fail. *State v. Corona*, 2025 UT App 93, ¶ 25, 574 P.3d 988, *cert. denied*, 574 P.3d 525 (Utah 2025). And such evidence need not "corroborate the witness's account across the board, in every particular." *Id.* (cleaned up). Draughon argues that "the testimony that could be considered corroboration raised more serious doubts about the allegations." Here, he points to the discrepancies between Sarah's and Brother's accounts of some of the incidents, including, for instance, the First Kitchen Incident where Sarah remembered that Draughon was standing behind her while Brother remembered that Draughon and Sarah were facing one another. The State argues, in contrast, that Brother's testimony corroborated Sarah's allegations.

¶44    The State's argument here has considerable force; after all, it's plausible, for example, that Brother was mistaken in his perception that Draughon and Sarah were facing one another when he saw them. And in any event, the important corroboration was that he saw them together engaging in what can be considered inappropriate conduct. But be all of that as it may, we need not limit our focus to whether these potential inconsistencies were problematic because there was plenty of other circumstantial evidence that corroborated Draughon's guilt, including the text messages, thereby precluding *Robbins*'s application here. As the State notes, Draughon's texts to Sarah were strong evidence that he had a "sexual obsession with [her] as she entered puberty." In those messages, Draughon (among other things) complimented her "butt," told her that Mother had "nice nipples" and that she would likely "have the same," said that he loved their "cuddles," and informed her that he had had a "stiffy" when he woke up in the middle of the night. At least one of the texts was also indicative of a consciousness of guilt to the extent it suggested Draughon tried to keep Mother from learning about his conduct. *Cf. State v. Hatch*, 2025 UT App 132, ¶ 30, 577

P.3d 903 (noting that evidence showing "consciousness of guilt" serves as proper noncharacter purpose under rule 404(b) of the Utah Rules of Evidence). In that message, Draughon said, "[Mother] is acting uptight about it. We need to not joke about it around her anymore, I guess. And/or even talk about any of that stuff anymore. Around her that is. We didn't do anything wrong. I'm sorry. I shouldn't of told her. It just slipped out."

¶45   In short, Draughon has not established that Sarah's testimony contained material inconsistencies or patent falsehoods, and he has overlooked the significant circumstantial evidence that corroborated Sarah's testimony. In other words, a *Robbins* objection would have been futile, and an attorney's failure to raise a futile objection does not constitute deficient performance. *See, e.g.*, *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546. Draughon's claim therefore fails for lack of deficient performance.

B.      General Insufficiency of the Evidence Argument

¶46   Draughon argues that there was insufficient evidence to support the conviction related to the Recliner Incident because Sarah's testimony was vague and included material inconsistencies. Again, we are not persuaded.

¶47   In assessing whether sufficient evidence exists to support a conviction, "we do not examine whether we believe that the evidence at trial established guilt beyond a reasonable doubt." *Jok*, 2021 UT 35, ¶ 29 (cleaned up). Instead, we ask "whether the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *Id.* (cleaned up). Stated otherwise, a court may not "substitute its judgment for that of the jury" when considering a challenge based on the sufficiency of the evidence. *Id.*

¶48    Draughon argues that "even after an attempt to refresh her recollection," Sarah could not "remember the details" related to the Recliner Incident other "than that it happened." The statute under which Draughon was charged provides, in relevant part, that "[a]n individual commits sexual abuse of a child if . . . the actor touches . . . the breast of a female child . . . with the intent to arouse or gratify the sexual desire of any individual." Utah Code § 76-5-404.1(2) (2021). Draughon does not attempt to argue that the State failed to prove intent. Instead, he suggests the State's evidence was insufficient to establish the "touch" element for two reasons: (1) Sarah's testimony was inconsistent because she initially claimed that Draughon touched the underwire of her bra and not her breast and (2) Sarah couldn't remember many of the details of the incident other than that it occurred.

¶49    Regarding the first point, it is true that Sarah initially testified that Draughon touched the underwire of her bra. However, Draughon ignores that Sarah had her recollection refreshed and subsequently testified that he had touched her breast. And we are in no place to second guess the jury's apparent decision to believe Sarah's refreshed testimony. *See, e.g., Jok*, 2021 UT 35, ¶ 29 (explaining that reviewing courts may not substitute their opinion for that of the jury on a sufficiency of the evidence challenge). With respect to the second point, Sarah testified that she was twelve or thirteen when Draughon touched her breast while they were sitting on a recliner and watching television. Assuming the jury found Sarah's testimony credible on this point—which, clearly, it did—we fail to see how this would not have been enough to support a finding that Draughon "touche[d] . . . the breast of a female child." *See* Utah Code § 76-5-404.1(2) (2021).

¶50    For these reasons, Draughon's argument that the evidence was insufficient to support his conviction on the count related to the Recliner Incident misses the mark.

## II. Phone Call Recording

¶51 Next, Draughon argues that Counsel rendered ineffective assistance by failing to object to the introduction of the recording of the phone call. He asserts that the recording was inadmissible under Utah's wiretap law because Friend was not a party to the call and neither Draughon nor Mother—the only two parties to the call—consented to the call being recorded. *See* Utah Code §§ 77-23a-4(7)(b), -7. He claims Counsel should have fought the battle of attempting to exclude the recording under that law because it included particularly problematic statements from both Draughon and Mother on which the State relied during argument and cross-examination. Even if the entire recording was not excludable under the wiretap law, Draughon argues that Counsel should have objected to portions of the recording under various provisions of the Utah Rules of Evidence. We assume, without deciding the issue on the merits, that Counsel's failure to object to admission of the entire recording constituted deficient performance. However, as discussed below in Part V, we conclude that the claim of ineffective assistance fails for lack of prejudice.

## III. Expert's Testimony on Grooming

¶52 Draughon argues that Counsel was also ineffective in not objecting to Expert's grooming testimony because the "testimony was inadmissible profile evidence" and was "highly prejudicial under rule 403" of the Utah Rules of Evidence. We assume without affirmatively deciding that Counsel's failure to object to this testimony constituted deficient performance, but as discussed

in Part V below, we conclude that the claim of ineffective assistance of counsel fails for lack of prejudice.[6]

### IV. Informing the Jury of Charge Classification

¶53   Draughon also argues that the district court plainly erred when it informed the jury that the child sex abuse counts were first-degree felonies during opening instructions. Demonstrating plain error requires a showing that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *State v. Cesspooch*, 2024 UT App 15, ¶ 9, 544 P.3d 1046 (cleaned up). The State concedes this was error and that it was obvious. Indeed, a defendant's "possible punishment . . . is usually not a proper matter for jury consideration." *Id.* ¶ 11 (cleaned up). However, as we discuss below, the error was ultimately not harmful.

### V. Cumulative Prejudice

¶54   We have assumed in two instances that Counsel was ineffective and identified another instance in which the district court obviously erred. *See supra* Parts II–IV. Draughon argues that

---

6. As the State correctly notes, our appellate courts have not squarely addressed the propriety of using an expert to testify about grooming, and we offer no view on the issue. Some courts have *required* expert testimony in order for grooming evidence to be introduced. *See, e.g., State v. Akins*, 315 P.3d 868, 878 (Kan. 2014). Others allow an expert to testify about grooming but don't require such testimony before grooming evidence can be introduced. *See, e.g., United States v. Isabella*, 918 F.3d 816, 833 n.15 (10th Cir. 2019). Still others have found little utility in having an expert testify on grooming and have expressed concern about the potential prejudice of admitting that kind of testimony. *See, e.g., State v. Braham*, 841 P.2d 785, 790 (Wash. Ct. App. 1992).

these errors, considered together, establish prejudice under the cumulative error doctrine. We disagree that these errors either individually or collectively were prejudicial because, even considering the counterfactual universe in which the trial proceeded without the errors, the jury would still have heard overwhelming evidence of Draughon's guilt such that our confidence in the verdict is not undermined. *See State v. Cheek*, 2015 UT App 243, ¶ 75, 361 P.3d 679.

¶55    Reversal under the cumulative prejudice doctrine requires that we "determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines [our] confidence in the outcome." *State v. Williams*, 2025 UT App 118, ¶ 38, 576 P.3d 1142 (cleaned up), *cert. denied*, 581 P.3d 554 (Utah 2025). "Because plain error and ineffective assistance of counsel share a common standard of prejudice, if we determine that [Draughon] is unable to make [a] showing on prejudice grounds, lack of prejudice will prove fatal to each of his claims." *Id.* ¶ 36 (cleaned up). When assessing prejudice in either context, we must consider what would have happened in the counterfactual universe in which the trial occurred without the asserted errors. *See, e.g.*, *State v. Chase*, 2025 UT App 158, ¶ 45, 580 P.3d 421 (ineffective assistance of counsel), *cert. denied*, 581 P.3d 560 (Utah 2025); *Williams*, 2025 UT App 118, ¶ 38 (plain error).

¶56    Here, the counterfactual scenario that we consider is one in which (1) the recording of the phone call was excluded in its entirety, (2) Expert was barred from testifying about grooming, and (3) the district court did not instruct the jury on the classification of the charged offenses. This leaves Sarah's testimony, Draughon's text messages, Mother's testimony about what Draughon said on the phone call, and other evidence, such as Draughon's factory reset of the iPad.

¶57    As an initial matter, we doubt the errors related to the grooming testimony and the jury instruction had much potential for prejudice. We first address Expert's grooming testimony. The Seventh Circuit has defined grooming as "deliberate actions taken by a defendant to expose a child to sexual material," with "the ultimate goal" being "the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011). The jury would hardly have needed Expert's testimony to reasonably infer from the evidence that Draughon deliberately sought to form an emotional connection with Sarah and exposed her to sexual material to prepare her for sexual activity. Now in a different case—where the evidence of the defendant's guilt isn't overwhelming—we might conclude that an expert's testimony on grooming, assuming that it is inadmissible, is prejudicial. After all, it's true that an expert's testimony runs the risk of jurors being "over-impressed by the aura of reliability surrounding the evidence, thereby leading them to abdicate their role of critical assessment." *Kofford v. Flora*, 744 P.2d 1343, 1362 (Utah 1987) (Durham, J., concurring in result).

¶58    But this is not that case. Expert's testimony here would merely have reinforced the jury's view rather than changed it. Even without Expert's opinion, the jury would have readily concluded that Draughon was grooming Sarah for sexual activity based on the significant evidence in the record, including his text messages, observed inappropriate affections, and admitted exposure to pornography, with follow-up inquiries about her reaction to that pornography. The concept of grooming is, sadly, ubiquitous in modern American society such that members of any jury are going to be generally familiar with it. In this case, Expert's generalized insights added little to what jurors likely already understood about grooming. Consequently, the court's admission of Expert's testimony, even if erroneous, had little prejudicial

effect, and it certainly did not produce harm sufficient to undermine our confidence in the verdict. *See, e.g.*, *State v. Yusuf*, 2025 UT App 189, ¶ 31, 582 P.3d 1270 ("An error is harmful if, absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant or our confidence in the verdict is undermined." (cleaned up)).

¶59 With respect to the court's obvious error on the jury instruction, the remedy would have been a corrective instruction informing the jury not to consider Draughon's potential punishment during its deliberations. Of course, the district court did exactly that at the end of the trial when it instructed the jury that it was not to "consider what punishment could result from a verdict of guilty" and that "[p]unishment is not relevant to whether the defendant is guilty." *See Williams*, 2025 UT App 118, ¶ 39 (explaining that the trial court obviously erred in informing the jury of the level of offenses but that the error was effectively cured by the court's "statements to the [jurors] that they were not to concern themselves with punishment"). We see little prejudice here. *See, e.g.*, *Yusuf*, 2025 UT App 189, ¶ 31.

¶60 This leaves the phone call. Notwithstanding the State's argument to the contrary, there is reason to be skeptical of its assertion that competent counsel would not have fought the battle of objecting to the recording. The jury heard Draughon say that he had been attracted to Sarah when she went through puberty, which corresponded to the time that the charged conduct occurred. And the prosecutor relied extensively on this statement, beginning his opening argument by quoting Draughon verbatim: "I never was attracted to her until she went through puberty." Equally problematic, in our view, was Mother's statement that Draughon's father believed the messages were evidence of grooming because (1) Draughon's father was a retired police officer who spent most of his career investigating crimes against children and (2) Draughon didn't specifically deny that his

conduct amounted to grooming.[7] The jury also heard Draughon espouse a questionable definition of "honesty," given his statement to Mother that he had been honest with her because he had not hidden the pornography incident from her "once [she] asked [him] about it." In a similar vein, although Draughon denied on the phone call that he had done anything other than show Sarah pornography, he had an obvious reason to be less than forthcoming because he believed—reasonably, as it turned out—that he could be investigated and charged. Finally, even if the recording had been somewhat beneficial to Draughon's defense, we are not persuaded that Counsel faced an "all or nothing" situation in which the recording either had to be admitted in its entirety or excluded in its entirety. Indeed, some of Mother's testimony about the call, such as her comment about what Draughon's father allegedly said, was objectionable and may well have been suppressed had Counsel objected. For these reasons, the State oversells the upside for Counsel to have the entire recording played for the jury.

¶61 However, Mother would still have been allowed to testify about her recollection of much of the call. Draughon resists this conclusion, arguing it would be "anomal[ous]" to exclude the recording while permitting her "less reliable" testimony on the issue. (Quoting *State v. Allen*, 241 P.3d 1045, 1062 (Mont. 2010)

---

7. On this point, we simply aren't persuaded by the State's argument that any issue here was cured by Draughon's father's testimony that he had "no recollection" of telling Mother that Draughon's conduct "sounded like grooming." This is so for two reasons. First, as noted, Draughon didn't specifically deny the grooming allegation in the phone call. And, more importantly, the jury would likely have been skeptical of Draughon's father's rehabilitative testimony because it would no doubt be understandable to a jury that a father with a son facing serious allegations would seek to protect his son.

(Nelson, J., concurring).) There is a split in authority over whether a party to a communication that is intercepted under a state's wiretap law can testify to his or her recollection of the communication. *Compare State v. MacMillan*, 872 A.2d 1031, 1037 (N.H. 2005) (concluding that police officer could testify to personal recollection of unlawfully intercepted communication because the testimony was "independent from the unauthorized recording"), *with Rupley v. State*, 560 P.2d 146, 147 (Nev. 1977) (rejecting the government's "novel argument that testimony regarding the intercepted telephone conversations is admissible because the witnesses were testifying from their personal recall of the conversations with the defendant, and not from the illegally obtained tapes"). Where, as here, the parties to the conversation had no advance knowledge that the communication was going to be "intercepted," we see no reason to bar the parties from testifying.

¶62 This proposition is consistent with Utah law. In *State v. Mitchell*, our supreme court addressed a case in which a defendant had been convicted of first-degree murder. 779 P.2d 1116, 1117 (Utah 1989). The court determined that the defendant was entitled to a new trial because a key witness was able to identify him only after she received hypnotherapy and the State relied heavily on her testimony. *Id.* at 1118–21. But as relevant here, the court rejected the defendant's argument that the trial court had erred in admitting the testimony of a telephone operator who placed a collect call on behalf of the defendant and inadvertently heard him say during the call that he had, in fact, killed the decedent. *Id.* at 1122–23. The court explained that the purpose of Utah's wiretap law was "to prohibit intentional surveillance activities in the absence of a court order" and that the trial court's admission of the operator's testimony did not run afoul of that purpose. *Id.* at 1123. That rationale applies with equal force to the instant case because Mother had no knowledge, before the call, that Friend was going to record the call. We therefore conclude that—even if

the recording of the call was inadmissible under applicable wiretap laws—Mother would still have been able to testify as to much of the content of the call. And this would have allowed the State to introduce the substance of the conversation into evidence, including Draughon's admissions about being attracted to Sarah.

¶63    Thus, considering that Mother would have still been able to testify about the content of the call, we conclude that there is no "reasonable likelihood of a more favorable outcome" for Draughon had the recording of the phone call been excluded such that "our confidence in the verdict is undermined." *Yusuf*, 2025 UT App 189, ¶ 31.

¶64    Even when we consider the cumulative effect of the errors, we cannot say that they affected the proceedings in a way that "undermines our confidence that a fair trial was had." *See State v. King*, 2017 UT App 43, ¶ 15, 392 P.3d 997. There is no serious dispute that Sarah testified to the facts underlying each of the charged incidents, including the one where she supposedly remembered little more than that the incident happened. *See supra* ¶¶ 46–49. And Draughon's texts were especially damning for his case in that they overwhelmingly supported a finding that he acted with intent to "arouse or gratify" his "sexual desire." *See* Utah Code § 76-5-404.1(2) (2021). Indeed, Draughon told Sarah, among other things, that he "wish[ed]" he could be there to "rub [her] butt," that it "made [his] day" when Sarah let him kiss her "on the lips" and "didn't make a weird noise," that Mother "has really nice nipples" and that Sarah would likely "have the same," and that Sarah's "butt always looks good." The jury also heard testimony that Draughon placed a dildo on his groin and had Sarah place her mouth and hands on it. The jury heard *still* more evidence that Draughon told Sarah that they should keep their conversations secret from Mother *and* that he subsequently performed a factory reset of his iPad in an apparent attempt to prevent the family from accessing those incriminating text

messages. To cap it off, the jury would still have heard Mother testify about her recollection of most of the phone call.

¶65 In short, the evidence of Draughon's guilt would still have been overwhelming even if trial had proceeded without the three potential errors we have identified. For this reason, we are not convinced that the errors were so prejudicial as to undermine our confidence in the outcome of Draughon's trial.[8]

CONCLUSION

¶66 Draughon failed to preserve his argument that Sarah's testimony was inherently improbable, and he has not

---

8. We likewise are not persuaded by Draughon's argument that but for the admission of the phone call there is a reasonable possibility that the jury would have acquitted on the obstruction of justice charge, which related to his obstruction of the investigation into the child sex abuse crimes. Here, Draughon's argument is somewhat unclear, but it seems to relate to the timing of when he reset the iPad, which happened the day after the phone call. He appears to reason that he could not have obstructed an investigation into crimes about which he was allegedly unaware—i.e., the child sex abuse charges—and that the timing of the reset confirmed this. The much more likely explanation is that Draughon knew the iPad contained the text messages that were indicative of his intent on the child sex abuse charges. Under the plain text of the obstruction of justice statute, the fact that the family could view the texts on Sarah's phone wouldn't have changed that. *See* Utah Code § 76-8-306(1)(c) (2021) ("[A]n actor commits obstruction of justice if the actor, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense . . . alters, destroys, conceals, or removes any item or other thing.").

demonstrated that Counsel rendered ineffective assistance in not moving for a directed verdict on inherent improbability grounds, because such a motion would have been futile. Draughon's general insufficiency of the evidence argument likewise falls short because there was evidence upon which the jury could have convicted him on the challenged count beyond a reasonable doubt. We have assumed that Counsel rendered deficient performance in failing to object to admission of the phone call recording and Expert's grooming testimony. We have also concluded that the district court committed obvious error when it read the classification of each of the charged offenses to the jury. Even when we consider the cumulative effect of these errors, however, we are not persuaded that Draughon was prejudiced by them. His cumulative prejudice argument therefore fails.

¶67    Affirmed.

_____